# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT PAMPLIN,    )
           )  Civil Action No. 10 - 227
      Plaintiff,  )
           )  Chief Magistrate Judge Lisa Pupo Lenihan
    v.     )
           )  ECF No. 32
CORRECTIONS OFFICER ANDY )
COULTER, CO BRODY, and   )
WARDEN RAMON RUSTIN,   )

      Defendants.

## MEMORANDUM OPINION

Plaintiff, Robert Pamplin, commenced this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 against two guards and the warden at the Allegheny County Jail ("ACJ") alleging claims of excessive force, failure to intervene, and failure to protect/supervise, in violation of the Eighth Amendment of the United States Constitution and state law claims of assault and battery and intentional infliction of emotional distress. (ECF No. 3.) By order dated October 15, 2010, the Court denied Defendants' Motion to Dismiss. (ECF No. 12.) Following discovery, however, Plaintiff moved to voluntarily dismiss his claims against Defendant Rustin (ECF No. 25). The motion was granted and Defendant Rustin was terminated from this action. (ECF No. 26.) The remaining two Defendants, Corrections Officer Andy Coulter ("Defendant Coulter") and Corrections Officer Brody ("Defendant Brody") have filed a Motion for Summary

Judgment.   (ECF No. 32.)   For the reasons that follow, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## A.  Summary Judgment Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact.  National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.  Finally, while any evidence used to support a motion for

summary judgment must be admissible, it is not necessary for it to be in admissible form.  *See*

Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909

F.2d 1524, 1542 (3d Cir. 1990).

### B.  Factual Background

On March 13, 2008, Plaintiff and three other inmates were being transferred between the

disciplinary housing unit ("DHU") and the general population unit at the Allegheny County Jail

("ACJ") by Defendant Brody.  As part of the out-transfer process, Defendant Coulter removed

each inmate's property from their respective locker in the hall outside the unit, placed each

transferring inmate's property into a clear bag labeled with the inmate's name, and left the bags

in the sally port area outside the unit for the inmates to claim upon leaving the unit.  Plaintiff

claims that when he received his property bag, he noticed that some of his property was missing.

As a result, he and Defendant Coulter had a verbal disagreement about the missing property.

This verbal exchange continued as Plaintiff walked down the hall with Defendant Brody and the

three other inmates towards the elevators off the unit.  As Plaintiff continued down the hallway,

away from Defendant Coulter who was standing at the other end of the hallway sorting trays, he

raised his voice and continued to argue with Defendant Coulter.  While Plaintiff maintains that

he only raised his voice in proportion to the growing distance between himself and Defendant

Coulter, Defendant Coulter contends that Plaintiff was screaming and threatening him.

Plaintiff claims that Defendant Coulter became "furious" with the questioning about the

missing property, and he contends that after he was waiting for the elevators at the other end of

the hallway, Defendant Coulter started to briskly approach him.  As Plaintiff explained in his

deposition,

> So while we were standing up at the elevator, myself and three other inmates and Officer Brody, Mr. Coulter started towards me in a brisk manner – he wasn't running or jogging but he was walking fast – grabbed the front of my shirt up around the collar.  There was a wall some feet behind me; I don't know how far.  Grabbed me by the collar, lifted me off the ground, ran with me and smashed my head into the wall, slapped me on the ground, hit my head off the floor again and sat on me and told me all I had to do was shut my fucking mouth.

(ECF No. 35-9 at 5.)  Plaintiff maintains that Defendant Coulter intentionally pushed him into the wall and pulled him down to the ground.  He also maintains that he did nothing to provoke Defendant Coulter's attack on him or necessitate the use of force.

Defendant Coulter recounts a different version of events.  Specifically, he contends that he approached Plaintiff in order to grab his arm and escort him back to the DHU.  He claims that, as he was advancing, he told Plaintiff that he was going back to the DHU, and claims that when he was approximately 6-7 feet away, Plaintiff dropped his property bag and lunged at or made an "aggressive" move towards him as if Plaintiff was going to grab or hit him.  Although Plaintiff did not hit him, Defendant Coulter grabbed Plaintiff's shirt around the chest area with both hands and pushed Plaintiff back towards the wall, which he claims was just a few feet behind him.  Plaintiff's head accidentally struck the wall and the two ended up on the ground where Plaintiff was eventually handcuffed.  Each grabbing underneath one of Plaintiff's arms, Defendants Coulter and Brody then attempted to escort Plaintiff back to the DHU but contend that he resisted their efforts by flailing his legs.  Although Plaintiff disputes resisting, he maintains that the officers "dragged" him back to the DHU and away from the medical unit even though they were aware that he was in immediate need of medical assistance.

Plaintiff contends that Defendant Brody failed to take action, prevent or stop Defendant Coulter's actions.  Specifically, Plaintiff maintains that Defendant Brody did not say anything when Plaintiff first addressed Defendant Coulter about his missing property, and, although he

4

saw Plaintiff make what he described as an "aggressive" move when Defendant Coulter was approximately 4-5 feet away, he did nothing.  He further contends that Defendant Brody was simply "standing there" and did not say or do anything or call for backup as Defendant Coulter was taking Plaintiff to the ground.

According to Defendant Brody, when he arrived in the sally port area on March 13, 2008 to escort Plaintiff and the three other inmates from the DHU to the general population, Plaintiff was already accusing Defendant Coulter of stealing his property.  He said he heard Defendant Coulter tell Plaintiff that he didn't steal anything.  He also said that he did not say anything to either Plaintiff or Defendant Coulter at the time because he was busy watching the other three inmates to ensure they did not get involved in the situation.  Defendant Brody maintains that, when the argument ensued, Defendant Coulter was approximately 4-5 feet away from Plaintiff when Plaintiff made what he characterized as an "aggressive" move by throwing his property bag to the ground, taking a step back, and putting his hands up.  He claims that Defendant Coulter then grabbed Plaintiff by the shirt and took Plaintiff to the ground.  He further claims that although he witnessed, for the most part, what occurred between Defendant Coulter and Plaintiff, the two were out of his view for a second and he did not get involved or call for backup because he had to have his hands free in case the other inmates decided to "jump" on him or Defendant Coulter.  Once on the ground, he claims that Plaintiff was swinging his arms while Defendant Coulter was holding him down.  He then assisted Defendant Coulter in lifting Plaintiff to his feet by grabbing him under the arm but Plaintiff was giving them a hard time by resisting. He claims that there was a lot of shouting and screaming by both Plaintiff and Defendant Coulter during the entire incident.

After the incident, Plaintiff was escorted back to the DHU and then later evaluated for injuries by the medical unit.  Plaintiff claims to have suffered physical and emotional harm as a result of Defendants' actions.  According to his medical records at the ACJ, Plaintiff suffered a head injury that was approximately five centimeters long and required sutures.  In addition to the laceration on his head, he suffered from a head contusion, a concussion, bruises and abrasions, blurry vision, headaches, and an injured finger.  Outside medical records report that Plaintiff suffered emotional distress and has been diagnosed with PTSD as a result of the incident.

Several hours after the incident, Captain Stanton issued an Incident Report wherein he reported that on March 13, 2008 at 4:00 p.m. he was called to the DHU by Defendant Coulter. When he arrived, he found Plaintiff on the ground with a cut on the back of his head.  He asked Defendant Coulter what happened and Defendant Coulter stated that when Plaintiff was being transferred he became verbally abusive accusing Defendant Coulter of stealing his belongings. After Defendant Coulter said he didn't take anything, Plaintiff continued to argue and refused to get on the elevator.  Defendant Coulter then told Plaintiff that he was going back to the DHU at which time Plaintiff dropped his belongings and came at Defendant Coulter in an aggressive manner.  The report states that Defendant Coulter used minimum force necessary to control Plaintiff and that Plaintiff hit his head on the wall causing a cut.  Captain Stanton admitted that he did not witness the incident and Plaintiff disputes the accuracy of the Captain's Incident Report.  Specifically, Plaintiff claims that he never refused to get on the elevators and that, prior to approaching him, Defendant Coulter neither issued him orders to return to the DHU nor indicated that he intended to take Plaintiff back to the DHU.  Most importantly, Plaintiff disputes making an aggressive move towards, attempting to attack, or threatening Defendant Coulter.

6

As a result of the incident, Defendant Coulter issued Plaintiff a misconduct report for disrupting the orderly running of the institution, refusing to obey an order, using abusive or obscene language, and assaulting or fighting an officer.  Additionally, Plaintiff was charged with and took a plea for simple assault.

On or about January 10, 2012, Plaintiff filed a private criminal complaint regarding the March 13, 2008 incident.  The Allegheny County Bureau of Corrections' Office of Internal Affairs conducted an investigation and, after conducting interviews with both Plaintiff and Defendant Coulter, issued a report concluding that the case would be forwarded to the Allegheny County Police for further review due to the contradicting statements of both parties.

## C. Discussion

Plaintiff's Complaint contains the following Five Counts: (1) excessive force under the Eighth Amendment against Defendants Coulter and Brody (Count I), (2) failure to intervene under the Eighth Amendment against Defendant Brody (Count II), (3) failure to protect/supervise against Defendant Rustin (Count III), (4) assault and battery under Pennsylvania state law against Defendants Coulter and Brody (Count IV), and (5) intentional infliction of emotional distress under Pennsylvania state law against Defendants Coulter and Brody (Count V).  Because Plaintiff has voluntarily dismissed his claims against Defendant Rustin, Count III is no longer viable.

## 1.  Failure to Exhaust Administrative Remedies

Defendants seek summary judgment against Plaintiff on the ground that he failed to exhaust his administrative remedies.  The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."
Proper exhaustion requires compliance with an agency's deadlines and other procedural rules.
Woodford v. Ngo, 548 U.S. 81, 91 n.2 (2006).   However, exhaustion is not required where
grievance procedures are not made available to an inmate.   *See* Mitchell v. Horn, 318 F.3d 523
(3d Cir. 2003) (holding that administrative remedies are not "available" where prison officials
deny the inmate the necessary grievance forms).

A plaintiff is a "prisoner" under the PLRA if he was a prisoner confined in a correctional
facility on the date the complaint was filed.   Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir.
2002).   Accordingly, litigants who file lawsuits challenging prison conditions after their release
from incarceration are not subject to the PLRA's exhaustion requirement.   Id.; *see also* Greig v.
Goord, 169 F.3d 165, 167 (2d Cir. 1999); Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir. 1998);
Janes v. Hernandez, 215 F.3d 541, 543 (5th Cir. 2000); Doe v. Washington Cty., 150 F.3d 920,
924 (8th Cir. 1998).   However, the PLRA exhaustion requirements apply if a prisoner is
incarcerated at one facility when his claim accrues, but is subsequently incarcerated at a different
facility when he files his claim.   Berry v. Kerik, 366 F.3d 85, 87 (2d Cir. 2003); Medina-Claudio
v. Rodriguez-Mateo, 292 F.3d 31, 35 (1st Cir. 2002).

Plaintiff was released from the ACJ on October 26, 2009 and was not incarcerated at the
time he brought this lawsuit on February 17, 2010.   Thus, at the time he filed this action Plaintiff
was no longer a prisoner subject to the PLRA.   Accordingly, Defendants are not entitled to
summary judgment on this ground.

## 2.   Count I – Excessive Force

### a.   Personal Involvement of Defendant Brody

Defendants first seek dismissal of Count I against Defendant Brody based on lack of personal involvement in the alleged excessive force violation.  A defendant in a civil rights action "'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations omitted).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Here, Plaintiff maintains that Defendant Brody entered the altercation once Plaintiff was on the floor and that both Defendants used excessive force on Plaintiff when they "dragged" him back to the DHU and away from the medical department.  There is no question as to whether Defendant Brody participated in escorting Plaintiff back to the DHU following the incident with Defendant Coulter.  Indeed, Defendant Brody admitted to assisting Defendant Coulter by grabbing Plaintiff underneath the arm, lifting him to his feet, and taking him to the DHU.  It appears, however, that Defendants have misconstrued the extent of Plaintiff's excessive force claim and the dispute herein lies as to whether this conduct by both Defendants amounted to a constitutional violation.  As such, Defendant Brody is not entitled to dismissal based on lack of personal involvement and the issue of his liability will be determined upon resolution of whether this conduct in escorting Plaintiff in the manner in which he alleges amounted to an unconstitutional excessive use of force.

   b.  Plaintiff's Excessive Force Claims Against Defendants Coulter and Brody

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted . . . ."  U.S. Const. amend. VIII; *see* Ingraham v. Wright, 430 U.S. 651, 664 (1977).  The cruel and unusual punishment clause "was

designed to protect those convicted of crimes" and, thus, prohibits the "unnecessary and wanton

infliction of pain" on prisoners in the custody of the state.  An Eighth Amendment violation will

therefore be found where the punishment at issue serves "no legitimate penological interest."

Id.; Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981).  *See* Giron v. Corrections Corp. of Am.,

191 F. 3d 1281, 1290 (10th Cir. 1999), quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)

(Where no legitimate penological purpose can be inferred from a prison employee's alleged

conduct . . . the conduct itself constitutes sufficient evidence that force was used "maliciously

and sadistically for the very purpose of causing harm").

Courts, however, generally defer to the judgment and policies of prison officials who are

charged with maintaining internal order and discipline in the prisons and often must make snap

decisions in volatile and dangerous situations.  Hudson v. McMillian, 503 U.S. 1, 6 (1992).

Officials must balance the threats presented by prison unrest to prison workers, inmates and

administrators "against the harm inmates may suffer if guards use force."  Id.  Because of these

concerns, the standard to measure the propriety of the use of force by prison authorities is

"whether the force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm."  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000)

(citing Hudson, 503 U.S. at 7).  To resolve the inquiry, courts are to consider:

> (1) the need for the application of force; (2) the relationship between the need and
> the amount of force that was used; (3) the extent of injury inflicted; (4) the extent
> of the threat to the safety of staff and inmates, as reasonably perceived by
> responsible officials on the basis of the facts known to them; and (5) any efforts
> made to temper the severity of a forceful response.

Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009).

As an initial matter, the Court notes that Plaintiff appears to allege two separate instances

of excessive force: (1) the initial incident involving Defendant Coulter and (2) the manner in

which he was escorted back to the DHU by both Defendants Coulter and Brody.  Each claim will be addressed separately.

      1.  <u>Incident involving Defendant Coulter</u>

Consideration of the above five factors lead this Court to conclude that genuine issues of material fact exist which preclude summary judgment on Plaintiff's claim that Defendant Coulter used unconstitutionally excessive force against him on March 13, 2008.  While Defendants contend that the application of force was necessary because Plaintiff created a disturbance in the jail and attempted to attack Defendant Coulter as evidenced by the aggressive move he made by throwing his property bag down and his hands up in the air, Plaintiff disputes these contentions and maintains that Defendant Coulter's attack on him was unprovoked and in response to becoming furious over the continued questioning about his missing property.  Specifically, Plaintiff attests that he never threatened nor attempted to attack or made any aggressive move toward Defendant Coulter and he further maintains that, prior to coming towards him, Defendant Coulter never stated that he was taking Plaintiff back to the DHU and never issued him any orders to return to the housing unit and/or get on the elevator.  In support of his position, Plaintiff has submitted the affidavit of Jasper Massey, one of the inmates transferred with Plaintiff on March 13, 2008, who states that he witnessed Defendant Coulter's attack on Plaintiff during the transfer process and that at no time prior to the attack did Defendants issue Plaintiff any orders. He also states that neither Defendant attempted to calm Plaintiff down about his missing property and that Defendant Coulter was cursing and telling Plaintiff to "shut the fuck up."  If a jury were to find Plaintiff's version of events credible, one could conclude that the situation did not call for the application of force in order to maintain or restore discipline and that Defendant Coulter's use of force on Plaintiff was solely to inflict harm.

Moreover, Plaintiff disputes Defendants' contention that he was taken to the ground by a reasonable means of force and that he "accidentally" struck his head on the wall.  Instead, Plaintiff contends that Defendant Coulter briskly came at him from at least ten feet away, made contact with him when the wall was approximately six to seven feet behind him, picked him up, rammed him back into the wall, pulled him to the ground, sat on him, hit his head off the ground, and told him "all you had to do was shut your fucking mouth."  Additionally, Plaintiff maintains that Defendant Coulter by no means attempted to temper the severity of his response because he did not issue Plaintiff any orders prior to approaching him.

There is a genuine dispute of material fact as to whether Defendant Coulter's use of force was objectively reasonable.  Since, according to Plaintiff, he did nothing to provoke or necessitate the use of force and Defendant Coulter's actions were designed to punish him for his earlier questioning about his property, a reasonable fact-finder could conclude that the force used was unconstitutionally excessive.  However, a jury, and not the Court, must resolve the disputed issues of fact by determining whose story to credit.  Accordingly, summary judgment will be denied as to this claim.

For similar reasons, qualified immunity will be denied to Defendant Coulter with regard to this excessive force claim.  Defendants assert that qualified immunity shields them from all allegations in this action.  Qualified immunity is not merely a defense to liability; it is immunity from suit.  Consequently, it is effectively lost if a case goes to trial when immunity should have been granted, and the issue is generally one for courts to resolve as early in the litigation process as possible.  *See* Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  It is Defendants' burden to establish that they are entitled to qualified immunity.  *See* Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989).

The qualified immunity analysis has two prongs.  The recent United States Supreme Court decision in <u>Pearson v. Callhan</u>, 129 S. Ct. 808 (2009) gives District Court judges discretion regarding the order in which they address the two-prong analysis in light of the circumstances of a particular case.  <u>Id</u>. at 818.  The first of the prongs is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right."  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  The court must also consider whether the right was "clearly established," that is, whether the "contours" of the right were delineated with such clarity that a reasonable officer in the defendant's circumstances would be aware that his conduct violated the right.  <u>Id</u>. at 201-02.

Because there are material issues of fact in dispute concerning what transpired during the incident in question, the Court cannot enter summary judgment as to whether Defendant Coulter is entitled to qualified immunity.  As previously mentioned, Plaintiff and Defendant Coulter offer conflicting accounts of the event in question.  Plaintiff claims that he did not make an aggressive move or fail to obey orders as Defendant Coulter suggests and maintains was the reason for the application of force.  Because it is unclear at this juncture whether Plaintiff made such an aggressive move and/or failed to obey orders and whether Defendant Coulter's use of force was objectively reasonable, the Court cannot determine whether Defendant Coulter's actions were lawful.  Accordingly, the Court will deny his request for summary judgment on the issue of qualified immunity at this time.

        2.  <u>Escort back to the DHU</u>

Plaintiff also appears to assert a claim for excessive force against both Defendants Coulter and Brody regarding the manner in which the two officers escorted him back to the DHU.  Specifically, Plaintiff contends that Defendants "dragged" him back to the housing unit,

which was in the opposite direction from the medical unit, despite the fact that he was not resisting and in need of immediate medical assistance.  He further contends that he did not resist the officers' efforts because, by their very own statements describing the incident in later reports, Defendants fail to mention any trouble in escorting Plaintiff back to his housing unit.

First, the Court notes that Defendants' failure to mention the fact that Plaintiff resisted the escort is not conclusive proof that such behavior did not occur.  Nevertheless, even if Plaintiff's version of events were credible, the Court finds that a reasonable trier of fact could not conclude that the amount of force used to escort him back to the DHU was unconstitutionally excessive.  Plaintiff has simply not demonstrated a genuine issue of material fact that the manner in which he was escorted was malicious or sadistic for the purpose of causing harm even assuming, as Plaintiff claims, that he did not resist.  The amount of force used by the officers resulted in little to no harm to Plaintiff and was notably not significantly disproportional to the goal of escorting Plaintiff back to the DHU.  Plaintiff also appears to suggest that the mere fact that he was escorted away from the medical unit despite Defendants' purported knowledge that he was in need of medical care somehow constitutes excessive force.  However, Plaintiff has provided no case law in support of this contention and the Court is unaware of any that holds such.  Accordingly, summary judgment will be entered in favor of both Defendants as to this claim.

### 3.  Count II – Failure to Intervene

Plaintiff alleges that Defendant Brody failed to intervene in connection with the excessive force claim against Defendant Coulter discussed in section (C)(2)(b)(1) *supra*.

"[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable

opportunity to intervene and simply refused to do so."  <u>Smith v. Mesinger</u>, 293 F.3d 641, 650 (3d

Cir. 2002).   The record evidence in this case reveals that Defendant Brody did not take any

action at the time of the incident in question but assisted Defendant Coulter in escorting Plaintiff

back to the DHU following the altercation.   While Defendants assert that Defendant Brody did

not have a reasonable and realistic opportunity to intervene because he was watching three other

inmates at the time the incident in question occurred, Plaintiff maintains that Defendant Brody

still had a the ability to intervene by, among other things, verbalizing his concern over Defendant

Coulter's actions.   Plaintiff also calls into question the sincerity of Defendant Brody's reasoning

for not intervening because of concern that the other inmates would get involved if left

unsupervised by pointing out that Defendant Brody eventually did leave the uncuffed and

unshackled inmates unsupervised when he aided in escorting Plaintiff back to the DHU

following the incident.

Here, the encounter between Plaintiff and Defendant Coulter is disputed and the issue of

whether Defendant Coulter acted unlawfully is a question of fact requiring jury determination.

Thus, the issue of whether Defendant Brody failed to intervene cannot be determined at this

time.  Further, if the situation is viewed in the light most favorable to Plaintiff, there is sufficient

evidence from which a reasonable jury could conclude that Defendant Brody was present, was

aware of Defendant Coulter's actions, and did nothing despite having a reasonable opportunity to

do so.   On the other hand, a jury may find that, even if Defendant Coulter's actions were

unlawful, Defendant Brody was not in a position to intervene on Plaintiff's behalf.   Either way,

the ultimate resolution of fact is entrusted to the jury and summary judgment will be denied as to

this claim.   Moreover, the Court will presently deny Defendant Brody's request for summary

judgment on the issue of qualified immunity for reasons similar to those stated in section (C)(2)(b)(1) *supra*.

**4.   Official Capacity Claims**

Plaintiff indicates that he is suing Defendants in their individual and official capacities as corrections officers at the Allegheny County Jail employed by Allegheny County.   An official capacity action brought against a public official is essentially the same as an action brought directly against the governmental entity of which he or she is an agent.   Hafer v. Melo, 502 U.S. 21, 25 (1991) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)).   As such, Plaintiff's claims against Defendants in their official capacity will be construed as claims against Allegheny County.

In Monell v. New York City Dep't of Social Servs., the United States Supreme Court held that municipalities and local governmental units are "persons" subject to liability under 42 U.S.C. § 1983.   436 U.S. 658 (1978).   Municipal liability may not be premised merely on the fact that the municipality employed the governmental official in question, that is, through application of the doctrine of *respondeat superior*.   Instead, municipalities can only be held liable under § 1983 when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."   Monell, 436 U.S. at 69. This requirement legally distinguishes the acts of the municipality itself from the acts of employees of that municipality, thus limiting liability only to instances for which the municipality is actually directly responsible.   Id.

To establish municipal liability pursuant to § 1983, Plaintiff is required to identify the policy, custom, or practice of the municipality that results in the constitutional violation.   Id. at 690-91.   A municipal policy is deemed to have been made when a decision-maker issues an

16

official decision or proclamation.  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986).  A custom or a practice, however, can be found with no official declaration, but by showing a course of conduct so permanent and widespread that it has the force of law.  <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990).  For liability premised upon a custom or practice, Plaintiff is required to demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker instead acted with deliberate indifference to the risk.  <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000).  Finally, Plaintiff is required to show either an "affirmative link" or "plausible nexus" between the custom or practice and the alleged constitutional deprivation.  <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850-51 (3d Cir. 1990).  So long as this link is not too tenuous, whether the municipality was the proximate cause of the constitutional violation and thus the injury to the Plaintiff, is a matter left to the jury.  <u>Id</u>. at 851 (citing <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985)).

In the present case, Defendants argue, and the Court agrees, that Plaintiff has failed to allege any policy, custom, or practice of Allegheny County that was the direct or even proximate cause of his injuries, or that a policy, custom, or practice created a pervasive, widespread pattern of injury to the citizenry via a multitude of excessive force claims.  Indeed, the only reference to a policy or custom in Plaintiff's Complaint is under Count III which was brought only against Warden Rustin; however, that count was voluntarily dismissed and Warden Rustin was terminated from this case on July 7, 2011.  Moreover, Plaintiff does not respond to Defendants' contention that they are entitled to summary judgment on the official capacity claims and instead argues only that Defendants' motion for summary judgment should be denied as to all claims in their individual capacities.  Because Plaintiff has failed to set forth specific facts showing that

there is a genuine issue for trial on his official capacity claims against Defendants Coulter and Brody, Defendants' motion for summary judgment will be granted on this basis.

**5.   Counts IV and V  – Pennsylvania State Law Claims**

  Defendants assert that they are entitled to summary judgment on Plaintiff's Pennsylvania state law tort claims of assault, battery, and intentional infliction of emotional distress on the basis of immunity.   In this regard, the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. C.S. §§ 8541-64, grants governmental immunity to local agencies, including municipalities, against claims for damages on account of any injury to a person or to property caused by their own acts or the acts of their employees.   Immunity is abrogated, however, for negligent acts falling into one of eight proscribed categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals.   42 Pa. C.S. § 8542(b).   An employee of a local agency acting within the scope of his duties enjoys the same immunity as the local agency, 42 Pa. C.S. § 8545, but the employee may be stripped of his immunity when he engages in conduct that is found to constitute "a crime, actual fraud or willful misconduct," id. § 8550.   In other words, the Act extends immunity to negligent acts by employees except those falling into the eight proscribed categories, but abrogates immunity for individual employees who commit intentional torts.   *See*, *e.g.*, Maloney v. City of Reading, No. 04-5318, 2006 WL 305440, at *5 (E.D. Pa. Feb. 8, 2006).

  Here, Plaintiff's Complaint sufficiently states claims based on the intentional torts of assault, battery, and intentional infliction of emotional distress against Defendants in their

individual capacities.    Thus, Defendants are not released from liability in their individual capacities based on governmental immunity.[1]

### D.  Conclusion

An Order consistent with this Memorandum Opinion, granting in part and denying in part Defendants' Motion for Summary Judgment, will follow.

Dated:  June 1, 2012

_____
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc:   Counsel of record.

---

[1]        The Court notes that many of the cases to which Defendants' cite to and rely on in support of their contention that they are entitled to immunity are distinguishable in that they involve Commonwealth defendants entitled to sovereign immunity pursuant to 1 Pa. C.S. § 2310.